**Dallas R. POORE**

v.

**David MATHEWS, Secretary of Health, Education and Welfare.**

**Civ. No. 3–75–141.**

United States District Court, E. D. Tennessee, N. D.

Nov. 17, 1975.

48

William A. Lockett, Walter, Gilbertson & Claiborne, Knoxville, Tenn., for plaintiff.

Edward E. Wilson, Asst. U. S. Atty., Knoxville, Tenn., for defendant.

### MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This case is before the Court on cross motions for summary judgment. Plaintiff, widow of a former coal miner, filed this action seeking review of the final decision of the Secretary of the Department of Health, Education and Welfare denying her claim for survivor's black lung benefits pursuant to the Federal Coal Mine Health and Safety Act, 30 U.S.C. § 901 *et seq.* (Supp.1975).

Plaintiff filed her claim for benefits on July 10, 1973, and the claim was denied by the Bureau of Disability Insurance of the Social Security Administration. A hearing examiner conducted a hearing at which plaintiff testified and was represented by counsel. The hearing examiner considered the claim *de novo* and rendered a decision favorable to plaintiff on November 1, 1974. (Tr. 10–14). The Appeals Council reviewed this decision on its own motion and reversed it on April 8, 1975. (Tr. 4–7). This determination is the final decision of the Secretary, from which plaintiff appeals.

### *Facts*

Plaintiff's deceased husband, Benjamin H. Poore, was born in 1913. He completed high school before becoming a coal miner in Kentucky in the early 1930's. He worked in underground coal mines as a coal loader and he also worked at the tipple. Plaintiff was married to the miner in 1935 and has not remarried since his death on November 16, 1970.

Plaintiff testified that her husband worked as a coal miner until 1943 when

they moved to Michigan in order for him to take a job in a defense plant. The hearing examiner found that the miner was employed in the coal mines for at least ten years. The miner did not return to coal mine employment after leaving it in 1943, and plaintiff testified that he did not seem to have any physical problems when he left coal mining. (Tr. 45).

The miner went to work in a paper mill in 1946 and continued to work there until sometime during the year of his death. Until about 1960, he worked as a machine operator which plaintiff described in her testimony as hard physical work. He worked the remainder of the time as an inspector because of his deteriorating health. The Statement of Earnings in the record indicates that he worked up to and including the year of his death, earning $7,145.91 in that year. (Tr. 65).

Plaintiff testified that during the time her deceased husband worked in the mines conditions were quite dusty. She said that her husband began having lung problems in the 1950's which caused him to cough and suffer sleeplessness; that he would spit up phlegm streaked with gray or black matter and small amounts of blood; that during his final illness, his chief complaint was soreness in his lungs; and, that his lungs had to be drained several times including the week prior to his death. Plaintiff also testified that in addition to his lung condition her deceased husband suffered from nephritis (kidney disease) and heart disease.

### Medical Evidence

Beginning in 1963 the miner was treated at the University of Michigan Department of Internal Medicine for cardiovascular disease, angina pectoris, a kidney disease and other illnesses. (Tr. 75–90). Doctors Robinson and Proskey reported in 1963 that the miner suffered "left pleural effusion and periocarditis, etiology undertermined"[1] in addition to the illnesses described above. Doctor Freud noted in a report that the miner suffered no shortness of breath, except that due to his pleuritic chest pains, and that the miner had no history of cough, except for a light productive cough he had suffered for many years. (Tr. 88). It was noted that the miner had smoked one to two packs of cigarettes per day for years.

Doctor Weller reported that when he treated the miner as an outpatient in June of 1970, the miner complained of angina but denied any history of shortness of breath. (Tr. 79). The angina disappeared with treatment and Dr. Weller felt that most of the miner's complaints were related to his "uncontrolled hypertension." The miner was placed on medication for this condition and on a salt-free, weight-reduction diet.

On November 9, 1970, the miner was admitted to a hospital in Michigan complaining of severe chest pains. On admission his blood pressure was elevated and some rales were noted in both lung fields. A chest X-ray taken on the date of admission was interpreted as showing the lung fields clear bilaterally and showing some enlargement of the heart (cardiomegaly). (Tr. 109–110).

Although some improvements were noted during the first few days of hospitalization, an electrocardiogram indicated that he might be developing pulmonary infarction.[2] The electrocardiogram was also compatible with acute pulmonary emboli and cor pulmonale.[3] The miner

---

1. Pleural effusion is the presence of fluid in the pleural cavities of the lungs. Pericarditis is an inflammation of the fibroserous sac that surrounds the heart. *Dorland's Illustrated Medical Dictionary*, 469, 1125 (24th ed. 1965). [hereinafter cited as *Dorland*].

2. Pulmonary infarction is defined as "infiltration of an airless area of lung with blood cells, resulting from obstruction of the pulmonary artery by an embolus [a blood clot which obstructs circulation] or thrombus [a clot in a blood vessel which remains at its point of formation]." *Dorland*, 478, 738, 1580.

3. Cor pulmonale is heart disease secondary to disease of the lungs or of their blood vessels. *Dorland*, 343.

passed away on November 16th after going into shock.

An autopsy was performed the next day by Dr. McLaughlin, a pathologist. He found evidence of pulmonary emphysema as well as evidence of a recent myocardial infarction.[4] Dr. McLaughlin noted the following in that portion of the autopsy report entitled "Clinical-Pathological Correlation:"

> "Death in this case was caused by recent myocardial infarct of the anterior wall of the left ventricle interventricular septum. This was secondary to recent thrombosis of the anterior descending branch of the left coronary artery. It was further complicated by subacute glomerulonephritis type of renal failure terminally." (Tr. 94).

The Death Certificate listed the immediate cause of death as "acute myocardial infarction" with the approximate period between onset and death listed as one week. The myocardial infarction was listed as due to, or as a consequence of "ASHD"[5] with the approximate period between onset and death listed as seven years. The underlying cause of the "ASHD" was listed but the figure used is unintelligible on the copy of the Death Certificate in the record. (Tr. 125).

After the hearing, the hearing examiner sent portions of the record to Dr. Schmidt, a doctor under contract with the Secretary and a Board-certified specialist in pulmonary diseases. (Tr. 126, 132). The hearing examiner submitted interrogatories to Dr. Schmidt. (Tr. 127–131). Dr. Schmidt was of the opinion that the miner had a respirable disease, *viz.* "pulmonary emphysema—with cor pulmonale and pleural effusion," and that the disease contributed "significantly" to the miner's death. (Tr. 130–131).

*The Claim*

Based on the evidence outlined above, the hearing examiner found that the miner died from a respirable disease, and that the miner's death was due to pneumoconiosis within the meaning of 20 C.F.R. § 410.462. Accordingly, he awarded plaintiff benefits.

Section 410.462 provides in its entirety as follows:

> *"Presumption relating to respirable disease."*
>
> "(a) Even though the existence of pneumoconiosis as defined in § 410.-110(*o*)(1) is not established as provided in § 410.454(a), if a deceased miner was employed for 10 years or more in the Nation's coal mines and died from a respirable disease, it will be presumed, in the absence of evidence to the contrary, that his death was due to pneumoconiosis arising out of employment in a coal mine.
>
> "(b) Death will be found due to a respirable disease when death is medically ascribed to a chronic dust disease, or to another chronic disease of the lung. Death will not be found due to a respirable disease where the disease reported does not suggest a reasonable possibility that death was due to pneumoconiosis. Where the evidence establishes that a deceased miner suffered from pneumoconiosis or a respirable disease and death may have been due to multiple causes, death will be found due to pneumoconiosis if it is not medically feasible to distinguish which disease caused death or specifically how much each disease contributed to causing death."

The Act itself provides that

> "If a deceased miner was employed for ten years or more in one or more coal mines and died from a respirable dis-

---

4. Myocardial infarction is defined as "the formation of an infarct [an area of blood coagulation resulting in an obstruction of circulation] in the myocardium [heart muscle], as a result of interruption of the blood supply to the area." *Dorland,* 738.

5. Although "ASHD" is not defined, presumably it stands for "arteriosclerotic heart disease." (Tr. 130).

ease there shall be a rebuttable presumption that his death was due to pneumoconiosis." 30 U.S.C. § 921(c)(2)

The Appeals Council apparently gave plaintiff the benefit of the presumption described above, but it found that the presumption was rebutted because the autopsy report "unequivocally" demonstrated that death was not due to pneumoconiosis. (Tr. 6).

Plaintiff contends that there is no substantial evidence to support this finding because the autopsy report shows on its face that in addition to the miner's heart and kidney trouble he was suffering from pulmonary edema and congestion, severe pulmonary edema fluid, massive cardiomegaly and changes of severe pulmonary emphysema. Plaintiff further points out that Dr. Schmidt had the entire autopsy report before him as well as other pertinent evidence when he determined that the miner had a respirable disease which contributed significantly in causing his death. (Tr. 126–131).

The Appeals Council noted that

"[t]he most probative and credible medical evidence in a black lung case is a complete autopsy report including gross and microscopic descriptions of the lungs or visualized portions of the lungs." (Tr. 6)

Based on the autopsy report and other evidence of record, we are of the opinion that there was substantial evidence to support the Secretary's finding that the miner's death was due to an acute myocardial infarction and not due to pneumoconiosis or a disease presumed to be pneumoconiosis. Although the question is a close one, it appears that it was "medically feasible" for the Secretary to determine that death was not due to pneumoconiosis or a disease presumed to be pneumoconiosis. See 20 C.F.R. § 410.-462(b).

The autopsy report itself states that "[d]eath in this case was *caused* by recent myocardial infarct . . ." (Tr.) 94 (emphasis added). Furthermore, the Regulations allow the Secretary to exercise "sound judgment" in deciding whether death was due to pneumoconiosis in cases in which a miner has less than 15 years coal mine employment. 20 C.F.R. § 410.454(b)(4). In such cases there must be a "severe lung impairment" and a "mere showing of a respiratory or pulmonary impairment" is not sufficient. *Id.* Although the evidence is conflicting in this case, especially the conclusions reached by Dr. McLaughlin in the autopsy and the somewhat different conclusions reached by Dr. Schmidt in his report, this Court cannot weigh the evidence and must therefore accept findings of the Secretary since they are supported by substantial evidence.

It should also be noted that "other relevant evidence" such as the miner's medical history and the plaintiff's testimony before the hearing examiner may be considered by the Secretary in determining whether death was due to pneumoconiosis. 20 C.F.R. § 410.-454(c). It appears from the record that such evidence was considered in this case. The regulations give considerable discretion to the Secretary in weighing other relevant evidence. The existence of this type of evidence can support a finding of death due to pneumoconiosis, but it does not compel such a finding where there is conflicting clinical evidence. *Wilson v. Weinberger,* 401 F.Supp. 276 (E.D.Tenn.1975).

For the reasons stated above, the Secretary's motion for summary judgment will be granted.

Order accordingly.